IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAMONT GORDON,                              *

     Plaintiff,                             *

v.                                          *       Civil Action No. GLR-19-1676

WEXFORD HEALTH SOURCES, INC.,               *
CORIZON HEALTH, INC.,
DANIEL CONN, CEO of Wexford,                *
JOHN MOSS, P.A.,
ROBUSTIANO BARRERA, M.D.,[1] and            *
DR. CARLS,
                                 *
     Defendants.

                             ***

## MEMORANDUM OPINION

    THIS MATTER is before the Court on Defendant Corizon Health, Inc.'s ("Corizon") Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 14) and Defendants Wexford Health Sources, Inc. ("Wexford"), Daniel Conn, John Moss, P.A., and Robustiano Barrera, M.D.'s (collectively, "Wexford Defendants") Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 22).[2] No hearing is

---

    [1] The Clerk shall amend the docket to reflect the full names and correct professional designations for Defendants John Moss, P.A. and Robustiano Barrera, M.D. as they appear in Wexford Defendants' dispositive Motion. (See ECF No. 22).

    [2] Also pending before the Court is Plaintiff Lamont Gordon's Motion for Appointment of Counsel (ECF No. 25). A court may appoint an attorney to represent any person proceeding in forma pauperis who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2018). In civil actions, a court may appoint counsel only in "exceptional" circumstances. Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984) (internal citations omitted), abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296 (1989).

necessary, and the Motions are ripe for review. See Local Rule 105.6 (D.Md. 2018). For reasons set forth below, the Motions will be granted.

## I.      BACKGROUND

Plaintiff Lamont Gordon is an inmate at the Maryland Correctional Training Center.[3] Gordon has a medical history of bilateral osteoarthritis in his knees. (Barrera Aff. ¶ 4, ECF No. 22-5).[4]

Gordon alleges that in 2002, after injuring his left knee in the gym at Jessup Correctional Institution, he was seen by Defendant John Moss, P.A., who instructed him to take aspirin and apply an ice pack on the knee. (Compl. at 3, ECF No. 1; Am. Compl. at 1, ECF No. 5).[5] Gordon claims he requested knee replacement surgery for more than twelve years thereafter but "was denied every time." (Am. Compl. at 1). During that time, Gordon received cortisone shots "every 2 to 3 months." (Compl. at 3). In 2012, Gordon was provided a cane to assist with walking. (Id.).

In August of 2016, Gordon awoke to find his left leg swollen from hip to foot. (Am. Compl. at 2). When Gordon tried to get up to seek help, he fell and hit his head on the

---

After reviewing Gordon's submissions in this case, it appears that he has the capacity to adequately present his claims, and no exceptional circumstances are present. Accordingly, appointment of counsel is unwarranted here, and Gordon's Motion will be denied.

[3] See http://dpscs.maryland.gov/inmate/search (last visited May 27, 2020).

[4] "Osteoarthritis/DJD [degenerative joint disease] is a progressive condition in which a joint may degenerate over time, but may also continue in a generally stable condition for some time." (Barrera Aff. ¶ 6).

[5] Citations to Gordon's Complaint and Amended Complaint refer to the page numbers assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

toilet. (Id.). According to Gordon, he was confined to a wheelchair for five months before Dr. Carls performed a total knee replacement on him in January 2017. (Id.). Gordon asserts that Dr. Carls "used a defective procedure, because after the first surgery, [Gordon] had to undergo a second surgery." (Id.). Additionally, Gordon states that Carls "closed the first incision with blood clots inside that caused [him] to have a temperature of 101 degrees for eight days, before it was discovered," and as a result the surgical site was reopened to "drain the blood clots and replace a part of the defective device." (Id.). After he was discharged from the hospital, Gordon spent fourteen days in the prison infirmary where he was given antibiotics and pain medication. (Id.). Gordon asserts that he suffers constant pain and needs pain medication everyday as a result of Defendants Moss, Barrera, and Carls's "neglect to make a timely decision to give him a knee replacement[] in 2002." (Id.).

According to Gordon's medical records, on June 23, 2008, Gordon was examined by Steven Cohen, M.D. at Johns Hopkins Hospital for complaints of bilateral knee pain from an accident that took place fifteen years before he was incarcerated. (Wexford Defs.' Mot. Dismiss Alt. Summ. J. ["Wexford Defs.' Mot."] Ex. 1 ["Medical Records"] at 2, ECF No 22-4). Gordon told Dr. Cohen that prior to his incarceration he had seen a private orthopedist who had diagnosed him with osteoarthritis and degenerative joint disease ("DJD") but advised against a knee replacement because he was too young. (Id.). Gordon informed Dr. Cohen that he had received several steroid injections that provided relief, but he could not return to his orthopedist for injections due to his incarceration. (Id.). Dr. Cohen

3

recommended capsaicin .025%[6] applied three times daily and bilateral knee corticosteroid injections. (Id. at 2–4).

On July 20, 2010, Gordon had arthroscopic surgery on his left knee at Bon Secours Hospital. (Id. at 5). Gordon's post-surgical treatment included pain medication, steroid and Synvisc[7] injections, and monitoring of his DJD. (Barrera Aff. at ¶ 6.)

On May 20, 2011, Moss saw Gordon, noting that Gordon had Synvisc injections in both knees on the previous day. (Medical Records at 8). Moss recorded that Gordon's knees were stable. (Id.).

In August of 2011, Gordon started physical therapy at Bon Secours Hospital. (Id. at 9).

On December 28, 2012, Ava Joubert, M.D. evaluated Gordon and observed that his three prior Synvisc injections had provided him some relief. (Id. at 10). Gordon's x-rays showed no evidence of acute disease. (Id.).

On February 7, 2013, Gordon was given a steroid injection in his left knee. (Id. at 11).

On June 11, 2013, Gordon was observed on a security video pitching horseshoes, jumping from side to side, walking without a limp, and waving his cane in the air. (Id. at

---

[6] Capsaicin topical is used for temporary relief of muscle or joint pain caused by strains, sprains, arthritis, bruising, or backaches. See https://www.drugs.com/mtm/capsaicin-topical.html (last visited June 15, 2020).

[7] Synvisc (hylan G-F 20) is similar to the fluid that surrounds the joints in the body. This fluid acts as a lubricant and shock absorber for the joints. Synvisc is used to treat knee pain caused by osteoarthritis. See https://www.drugs.com/synvisc (last visited May 28, 2020).

12). This was taken as evidence that Gordon did not need a cane, so it was confiscated as a potential weapon. (Id.).

On November 14, 2013, Dr. Barrera met with Gordon for the first time. (Id. at 14–15). Gordon told Barrera that the Synvisc injections did not help, his pain kept him awake at night, and he was concerned his knee would give out. (Id. at 14). Gordon said he was prescribed Neurontin 600mg, which provided some relief. (Id.). Barrera noted that Dr. Krishnaswamy, the orthopedist who had evaluated Gordon in the past, suggested that Gordon would eventually need a knee replacement, but observed that Gordon could walk and complete his daily activities and had no history of falling. (Id.). Barrera's physical examination revealed that Gordon had a severe deformity over his left knee and was unable to straighten his left knee fully, but no excess fluid was present. (Id.). Barrera also observed that Gordon's right knee was also deformed—but less so than the left knee—and the range of motion was almost intact. (Id.). Barrera prescribed Gordon Tramadol 50 mg twice daily for pain. (Id. at 14–15). According to Barrera, knee replacement surgery was not indicated at the time; instead, conservative treatment for Gordon's DJD was appropriate. (Barrera Aff. ¶ 7).

On March 15, 2014, Gordon was given a steroid injection in his left knee. (Medical Records at 16).

On May 17, 2016, during a visit with Nurse Practitioner Peggy Mahler, Gordon rated the pain in his left knee as a ten on a scale of one to ten. (Id. at 17). Mahler noted that Gordon walked with a cane and limped. (Id.). Gordon explained that his knee sometimes gave out when walking and asked to see an orthopedist. (Id.). Mahler noted that Gordon's

recurring left knee injury had been treated with "multiple arthroscopic surgeries & [S]ynvisc i[nj]ections" and that there had been a "[c]onsult placed by physician provider for Dr[.] Carls on 4/20/16[.]" (Id.). At the time of this visit, Gordon was prescribed Tramadol ER 300 mg QD, Tylenol 500 mg, Glucosamine, Indocin 50 mg, Robaxin 500 mg, and Neurontin 800 mg. (Id.). Gordon was also scheduled to begin physical therapy later that day. (Id.).

On June 10, 2016, Gordon was provided a knee sleeve. (Id. at 27). During June and July 2016, Gordon received physical therapy. (Id. at 18–25). Gordon was discharged to self-management on August 4, 2016 after he was assessed to have achieved the optimum benefit from physical therapy. (Id. at 25).

On July 10 and August 6, 2016, Ali Yahya, M.D. injected Gordon's left knee with a steroid and performed an arthrocentesis, or a collection of synovial fluid from the joint. (Id. at 37, 39; Barrera Aff. ¶ 8).

On August 1, 2016, Dr. Barrera evaluated Gordon and noted that physical therapy and steroid injections had not provided much help in alleviating Gordon's knee pain and that Gordon was in a wheelchair. (Medical Records at 38; Barrera Aff. ¶ 8). Barrera then referred Gordon to Dr. Carls for evaluation. (Medical Records at 38).

Gordon was scheduled to see Dr. Carls in September 2016, but the appointment was rescheduled because the prison was on lockdown. (Id. at 48). In late September or October

2016, Dr. Carls examined Gordon and recommended a total left knee replacement.[8] (Id. at 53).

On December 13, 2016, Barrera again examined Gordon and observed that he limped when he walked and used a wheelchair for long distances. (Id. at 61). Gordon indicated he could not walk more than fifty yards without aggravating the pain, his left knee occasionally gave out while walking, and he could not stand longer than ten minutes without the knee giving out. (Id.). Gordon was also unable to straighten his left knee completely due to the deformity. (Id.). Barrera agreed with Carls that a total left knee replacement was needed and placed a surgical consult for Gordon, which was approved. (Id. at 61, 63; Barrera Aff. ¶ 8). On January 19, 2017, Barrera performed Gordon's pre-operative examination. (Medical Records at 65).

On January 30, 2017, Dr. Carls performed a total knee arthroplasty on Gordon at Western Maryland Regional Medical Center ("WMRMC"). (Id. at 68–70, 75). Two weeks later, on February 7, 2017, after Gordon had a fever, worsening left knee pain, and a hematoma, Gordon underwent a second procedure called a hematoma evacuation. (Id. at 72, 73). The purpose of the second procedure was "to wash out his knee to ensure this was not an infection process and also exchange the polyethylene as well." (Id.). During the procedure, the polyethylene was removed and Gordon's knee was thoroughly debrided. (Id.). Cultures from tissue, fluid, and hematoma that were sampled during the procedure

---

[8] Wexford indicates that Dr. Carls's report is not in Gordon's medical records. (Wexford Defs.' Mot. at 6 n.3).

showed no evidence of infection, and "[h]is fluid and hematoma appeared normal . . . ." (Id.). Gordon was discharged from WMRMC on February 10, 2017. (Id. at 73, 77).

After his discharge from WMRMC, Gordon was admitted to the Western Correctional Institution infirmary where, pursuant to the discharge instructions, he was placed on intravenous antibiotics for two weeks followed by oral antibiotics for four weeks. (Id.; Barrera Aff. ¶ 9). Although Gordon initially showed symptoms of a fever, his condition improved over time. (Medical Records at 103, 104, 109, 111). Since his surgery, Gordon has received regular treatment for any pain associated with his knee condition. (See Medical Records at 77–181; see also Corizon Mot. Dismiss Alt. Summ. J. ["Corizon Mot."] Ex. B ["Nimely Aff."] ¶¶ 6–9, ECF No. 14-5).

On June 5, 2019, Gordon filed a Complaint against Corizon and Wexford, alleging that Defendants failed to properly treat his left knee condition. (ECF No. 1). On July 3, 2019, Gordon filed the Amended Complaint, adding Daniel Conn, John Moss, P.A., Robustiano Barrera, M.D., and Roy Carls, M.D. as Defendants. (ECF No. 5). Gordon seeks compensatory damages. (Compl. at 5).

On September 20, 2019, Corizon filed a Motion to Dismiss or, Alternatively, for Summary Judgment. (ECF No. 14). On November 13, 2019, Wexford Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 22). On January 9, 2020, Gordon filed a Motion to Deny Defendants' Motion to Dismiss or Alternatively, for Summary Judgment, which the Court construes as an Opposition. (ECF No. 28). Corizon filed a Reply on January 21, 2020. (ECF No. 29). To date, the Court has no record that Wexford Defendants filed a Reply.

8

## II.     DISCUSSION

### A.     Standard of Review

#### 1.     Conversion

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." Bosiger v. U.S. Airways, Inc., 510 F.3d 442, 450 (4th Cir. 2007). Pursuant to Rule 12(d), however, a court has the discretion to consider matters outside of the pleadings in conjunction with a Rule 12(b)(6) motion. If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." Id. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action,"

9

and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. Id. at 165–67. "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it." Id. at 165. By contrast, when the extraneous material is "scanty, incomplete, or inconclusive, the district court probably will reject it." Id. at 165–66.

A court may not convert a motion to dismiss to one for summary judgment sua sponte unless it gives notice to the parties that it will do so. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998). In this case, pursuant to the dictates of Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the Court notified Gordon of his right to respond and advised that he may file affidavits, declarations, and exhibits along with his response to Defendants' Motions. (See ECF Nos. 15 & 24). However, Gordon did not file any affidavits or exhibits with his Opposition, nor did he submit a Rule 56(d) affidavit expressing a need for discovery. Additionally, Defendants expressly captioned their Motions "in the alternative" for summary judgment and submitted matters outside the pleadings for the Court's consideration. In that circumstance, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." Laughlin, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); see Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous

materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); <u>Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.</u>, Civ. No. JFM–10–0206, 2010 WL 2732334, at *3 (D.Md. July 8, 2010). Accordingly, the Court will construe Defendants' Motions as motions for summary judgment.

### 2.   Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material

fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)). Furthermore, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" Id. at 252. Further, if the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving

12

party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.   Analysis**

**1.   Eighth Amendment**

Gordon claims that Moss, Barrera, and Carls failed to provide adequate medical treatment for his left knee injury in violation of his Eighth Amendment rights.

In order to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that a defendant's actions or the failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241). In a case involving a claim of deliberate indifference to a serious medical need, the inmate must also show a "significant injury." Danser v. Stansberry, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

13

The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, i.e., with "a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991); see Farmer, 511 U.S. at 839–40; Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016). "To show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Lightsey, 775 F.3d at 178 (emphasis omitted). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." Lightsey, 775 F.3d at 178; see also Scinto, 841 F.3d at 225. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." Grayson v. Peed, 195 F.3d 692, 695–96 (4th Cir. 1999).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." Johnson v. Quinones, 145 F.3d 164, 166 (4th Cir. 1998). Of course, if a risk is obvious, a prison official "cannot

14

hide behind an excuse that he was unaware of a risk." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995). An inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Wester v. Jones, 554 F.2d 1285, 1286 (4th Cir. 1977) (per curiam). Rather, an inmate must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. See Startz v. Cullen, 468 F.2d 560, 561 (2d Cir. 1972); Smith v. Mathis, PJM-08-3302, 2012 WL 253438, at * 4 (D.Md. Jan. 26, 2012), aff'd, 475 F.App'x 860 (4th Cir. 2012); Lopez v. Green, PJM-09-1942, 2012 WL 1999868, at * 2 (D.Md. June 4, 2012); Robinson v. W. Md. Health Sys. Corp., DKC-10-3223, 2011 WL 2713462, at *4 (D.Md. July 8, 2011).

Gordon claims that Moss and Barrera were deliberately indifferent to his serious medical condition because they failed "to make a timely decision to give him a knee replacement." (Am. Compl. at 1, 2). These claims fall short. First, Moss was "a mid-level provider," meaning that he "could only submit a consult request for surgical evaluation and could not approve such a request, much less the surgery itself." (Moss Aff. ¶ 4, ECF No. 22-6). Additionally, although Moss states he has no independent recollection of his visit with Gordon in 2002, he avers that had he been presented with such a complaint, he would have performed a thorough examination and prescribed appropriate treatment. (Id. ¶ 5). Moss also states that if he had recommended applying ice and prescribed aspirin, then nothing more would have been indicated at the time, adding that many knee injuries present with mild inflammation and pain do not require treatment beyond ice and aspirin. (Id.). In

15

light of the unrefuted evidence that Moss treated Gordon's injuries at the time in accordance with his authority as a mid-level provider, it is clear that Moss's conduct does not amount to deliberate indifference.

Likewise, the record evidence refutes any suggestion that Barrera failed to provide constitutionally adequate care for Gordon's serious medical needs. After evaluating Gordon for the first time in 2013, Barrera initially "continued [Gordon] on conservative treatment for his degenerative joint disease" by prescribing pain medicine, steroid injections, and certain non-invasive therapies. (Barrera Aff. at ¶ 7). When Gordon's pain suddenly worsened in 2016, Barrera recognized that Gordon's condition was not responding to conservative treatments and promptly referred him to Dr. Carls for consultation, resulting in Gordon's knee replacement surgery roughly six months later. (Id. ¶¶ 8-9). While Gordon may have disagreed with Dr. Barrera's initial decision to continue conservative, non-surgical treatment in lieu of surgery, disagreement between an inmate patient and his medical provider about the appropriate course of treatment does not support a claim of deliberate indifference. See Wright, 766 F.2d at 849. As such, Moss and Barrera are entitled to summary judgment.[9]

---

[9] Separately, Wexford Defendants argue that the claims against Moss and Barrera are barred by the statute of limitations. There is no federal statute of limitations for actions under 42 U.S.C. § 1983 (2018), and the limitations period for § 1983 claims is to be determined by the analogous state law statute of limitations. See Wallace v. Kato, 549 U.S. 384, 387 (2007). In Maryland, the applicable statute of limitations is three years from the date of the occurrence. See Md. Code Ann., Cts. & Jud. Proc. § 5-101. The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995) (citing United States v. Kubrick, 444 U.S. 111, 122–24 (1979)).

Gordon also asserts that Dr. Carls was deliberately indifferent to his serious medical condition because Dr. Carls "used a defective procedure" during Gordon's knee replacement surgery, which caused Gordon to suffer from a fever and forced him "to undergo a second surgery" to "drain the blood clots and replace a part of the defective device." (Am. Compl. at 2). Gordon's medical record corroborates his assertions that he suffered from a fever and underwent a second procedure; nonetheless, this evidence does not support a finding of deliberate indifference. Dr. Carls immediately recommended knee replacement surgery after evaluating Gordon's condition—as such, Dr. Carls both recognized the seriousness of Gordon's condition and took steps to ensure that he would receive adequate medical care. See Farmer, 511 U.S. at 837. And even if Dr. Carls's actions during the surgery amounted to negligence, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." See Lightsey, 775 F.3d at 178. Therefore, the Court will enter judgment in Dr. Carls's favor.[10]

---

Because Gordon filed his Complaint on June 5, 2019, claims that predate June 5, 2016 are barred by the statute of limitations. Gordon's claims against Moss and Barrera arise out of acts and omissions that took place in 2002 and 2013, respectively. Accordingly, even if the Court declined to enter summary judgment in favor of Moss and Barrera, Gordon's claims against them would nonetheless be dismissed as time barred.

[10] The Court notes that service was not obtained on Dr. Carls; therefore, Carls did not join Wexford Defendants' Motion or otherwise respond to Gordon's Amended Complaint. Nonetheless, the Court finds there is sufficient evidence in the record to enter summary judgment in favor of Carls.

In sum, because their conduct did not amount to a violation of Gordon's constitutional rights, Moss, Barrera, and Carls are entitled to summary judgment as to Gordon's Eighth Amendment claim.[11]

### 2.      Supervisory Liability

Gordon also brings an Eighth Amendment claim against Daniel Conn, Wexford's Chief Executive Officer, alleging that Conn caused him to be subjected to cruel and unusual punishment by hiring Moss, Barrera and Carls to administer health care to inmates. (Am. Compl. at 1). As such, Gordon's claim against Conn is based on supervisory liability.

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). To prevail on a supervisory liability claim, a plaintiff must show: (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff;" (2) "the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization;" and (3) "an affirmative causal link

---

[11] To the extent Gordon attempts to bring a state law claim of negligence or medical malpractice against these healthcare providers, these claims must fail, as there is no evidence in the record that Gordon satisfied the mandatory prerequisites for filing such a claim in court by first submitting it to the Maryland Health Claims Arbitration Board as required under state law. See Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04 et seq.

between the supervisor's inaction and [plaintiff's constitutional injury]." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), cert. denied, 513 U.S. 813 (1994).

Here, Gordon alleges that Conn "should have monitored" Moss, Barrera, and Carls. (Am. Compl. at 2). However, the record is devoid of any evidence showing that Conn had actual or constructive knowledge of purported unconstitutional conduct by his subordinates. To the contrary, there is evidence in the record that Conn, as the CEO of Wexford, is not directly responsible for hiring or overseeing Wexford's medical providers. (Barrera Aff. ¶ 11). Furthermore, Gordon cannot demonstrate any constitutional injury here, as the record shows that Conn's subordinates provided Gordon constitutionally adequate treatment for his knee condition, including multiple surgeries, steroid and Synvisc injections, physical therapy, pain medication, and assistive modalities, such as a cane and knee brace. As such, Conn is entitled to summary judgment in his favor.

### 3.  Respondeat Superior

Corizon and Wexford are private corporations that have contracted with the Department of Public Safety and Correctional Services ("DPSCS") to provide medical care to inmates at Maryland facilities.[12] Because Gordon makes no direct allegations against Corizon and Wexford, it appears that Gordon attempts to hold these corporations liable for the conduct of their agents and employees through the doctrine of respondeat superior. See,

---

[12] Between 2005 to June 30, 2012, Corizon was the contractual medical provider for the DPSCS. (Corizon Mot. Ex. A ["Tinney Dec."] ¶ 4, ECF No. 14-4). Between July 1, 2012, and December 31, 2018, Wexford served as the contractual medical provider for the DPSCS. (Id. ¶ 5). On January 1, 2019, Corizon again became the contractual medical provider for the Maryland DPSCS. (Id. ¶ 6).

e.g., Robinson v. Corr. Med. Servs., Inc., No. CIV. PWG-13-880, 2013 WL 6383106, at *8 (D.Md. Dec. 4, 2013) (noting that Corizon and Wexford administer medical care only through their agents and employees).

As a preliminary matter, it is well established that there is no respondeat superior liability under § 1983. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Furthermore, to the extent Gordon complains about the actions of individual employees of Corizon and Wexford, the facts show that Gordon's medical providers did not act with the requisite deliberate indifference to deprive him of adequate medical treatment. For these reasons, summary judgment will be entered in favor of Corizon and Wexford.

### III.    CONCLUSION

For these reasons, Corizon's Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 14) and Wexford Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 22) will be granted. Gordon's Motion to Deny Defendants' Motion to Dismiss or Alternatively, for Summary Judgment (ECF No. 28) and Motion for Appointment of Counsel (ECF No. 25) will be denied. A separate Order follows.

Entered this 26th day of June, 2020.


_____/s/_____
George L. Russell, III
United States District Judge